# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00601-COA

**RICHARD BOYINGTON A/K/A RICHARD LEE BOYINGTON**  APPELLANT

**v.**

**STATE OF MISSISSIPPI**  APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 05/09/2022 |
| TRIAL JUDGE: | HON. JON MARK WEATHERS |
| COURT FROM WHICH APPEALED: | FORREST COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LAUREN GABRIELLE CANTRELL |
| DISTRICT ATTORNEY: | LIN CARTER |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/15/2023 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., WESTBROOKS AND McDONALD, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.     Richard Boyington appeals his Forrest County Circuit Court jury conviction of fleeing a law enforcement officer and being a felon in possession of a firearm. The circuit court sentenced Boyington to serve five years in the custody of the Mississippi Department of Corrections for each conviction, with the sentences set to run consecutively. On appeal, Boyington raises one issue: the alleged improper admission of a photograph of a swastika tattoo on Boyington's body. Having reviewed the record and the arguments of counsel, we affirm Boyington's convictions and sentences.

## FACTS

¶2.     On the evening of September 28, 2019, Forrest County Deputy Sheriff Scott Smith radioed dispatch to report that he had stopped a motorcyclist on a black street bike that had no license plate. But as Smith was about to exit his patrol car, the motorcyclist sped off. A high-speed chase ensued for a mile and a half. The motorcyclist wore a helmet, but his long hair stuck out beneath it. At no time did Smith see the motorcyclist's face, but during the chase, Smith radioed in a description of the driver, saying that the driver "had on a T-shirt that was blowing up and he (Smith) could see tattoos on the [driver's] back area."

¶3.     The chase continued until the motorcycle went off the road in a curve. The driver, however, was able to escape into the woods. He no longer had the helmet on, and Smith could clearly see his hair color, hair style, height, and build. Smith said he was a white male with "brownish-colored" hair. Smith attempted to pursue the motorcyclist, but the deputy became entangled in the brush. Other deputies came to the scene and surrounded the area, but they were unable to find the motorcycle driver.

¶4.     Smith returned to the site of the crash and retrieved a grey backpack that was lying beside the motorcycle. Smith did not recall seeing the backpack on the motorcycle during the pursuit. In it, Smith found a knife, a nine-millimeter firearm, a nine-millimeter magazine with one bullet, and a California ID issued to "Marjorie Hedden." Deputy Sheriff Austine Extine, who also came to the scene, testified that Hedden was known by law enforcement as a local girl, Marjorie Hedden Shows.[1] Law enforcement took no fingerprints or DNA samples from anything on the bike or backpack. The helmet was not retrieved from the scene

---

[1] It is unknown why Ms. Shows, a local resident, had a California ID.

2

either.

¶5.     Several days later, law enforcement went to Shows's home and asked her about the backpack recovered at the scene of the motorcycle incident. Shows admitted that she had been riding the motorcycle with Boyington, whose nickname was "Psycho," earlier on the day in question. Shows said that Boyington texted her later that day. He told her to go to Steve Brewer's house and tell Brewer that he (Boyington) was running from the police. Shows did this and went to Brewer's home, which is about a mile from the place where the motorcycle went off the road and is accessible from the woods. Shows said that Boyington eventually arrived at Brewer's, out of breath and with a swollen knee.

¶6.     Shows was arrested as an accessory after the fact, but she was told that the charge would "go away" if she testified against Boyington. At trial, she identified the backpack that contained her ID as the backpack that Boyington had with him on the motorcycle.

¶7.     On October 1, 2019, Forrest County Sheriff's Investigator Rafael Bailey went to Brewer's home. Brewer was not there, but Bailey spoke to an individual who identified himself as "Tommy Morrison." This man said that he had heard of a person named Richard Boyington, but he knew nothing else. Bailey asked the man to have Brewer call him when he got back. Bailey continued his investigation, trying to determine any affiliation among the key players, Brewer, Shows, and Boyington. Bailey found a photo of Boyington and discovered that the "Tommy Morrison" he had spoken to was really Boyington.

¶8.     On October 2, 2019, Bailey obtained an arrest warrant for Boyington and first went to Brewer's home. Brewer told him that he had taken Boyington to Shows's house. Bailey

3

and Brewer proceeded there, where they met other officers, including Deputy Smith, to execute the arrest warrant. Investigator Bailey went inside while Smith remained outside. When they encountered Boyington, he put his hands on his head, interlocking his fingers, and knelt on the ground. After Boyington peacefully surrendered, law enforcement brought him outside. They lifted up Boyington's shirt, showed Boyington's tattoos to Smith, and asked Smith if he recognized them. Smith said that he did not recognize any of the specific tattoos but that they were in a similar area of Smith's body as were the tattoos of the person who was riding the motorcycle. Smith also said that Boyington's hair color was the same as the color of the hair of the man that Smith saw fleeing into the woods. At trial, Smith identified Boyington as the man driving the motorcycle whom Smith had pursued.

¶9. On March 17, 2020, Boyington was indicted on charges of felony fleeing or eluding law enforcement in violation of Mississippi Code Annotated section 97-9-72(2) (Rev. 2020)[2]

---

[2] Felony fleeing is defined in Mississippi Code Annotated section 97-9-72(1)-(2):

(1) The driver of a motor vehicle who is given a visible or audible signal by a law enforcement officer by hand, voice, emergency light or siren directing the driver to bring his motor vehicle to a stop when such signal is given by a law enforcement officer acting in the lawful performance of duty who has a reasonable suspicion to believe that the driver in question has committed a crime, and who willfully fails to obey such direction shall be guilty of a misdemeanor, and upon conviction shall be punished by a fine not to exceed One Thousand Dollars ($1,000.00) or imprisoned in the county jail for a term not to exceed six (6) months, or both.

(2) Any person who is guilty of violating subsection (1) of this section by operating a motor vehicle in such a manner as to indicate a reckless or willful disregard for the safety of persons or property, or who so operates a motor vehicle in a manner manifesting extreme indifference to the value of human life, shall be guilty of a felony, and upon conviction thereof, shall be punished

and possession of a weapon by a felon, in violation of section 97-37-5 (Rev. 2020).[3] Boyington had previously been convicted of capital murder on November 30, 1987.

¶10. Prior to trial, Boyington moved to exclude the (1) testimony from law enforcement witnesses purporting to identify Richard Boyington as the rider of a black motorcycle, (2) testimony from law enforcement that constituted hearsay from other witnesses, and (3) testimony about the nature of Boyington's prior felony. During the hearing on the motion, the issue of any mention of the words "Aryan Brotherhood," or the initials "AB" came up, and the circuit court agreed that Boyington's past association with the group was irrelevant, not probative, and highly prejudicial. The parties also agreed to stipulate to Boyington's prior felony conviction without going into the nature of that felony. The circuit court also heard testimony from Deputy Smith concerning his identification of Boyington. Smith testified about the attempted stop, the chase, and his later encounter with Boyington at the time of Boyington's arrest when Smith was asked to look at the tattoos on Boyington's back. The State presented Smith with two photographs taken of Boyington: one of the tattoos on

by a fine not to exceed Five Thousand Dollars ($5,000.00), or by commitment to the custody of the Mississippi Department of Corrections for not more than five (5) years, or both.

[3] Mississippi Code Annotated section 97-37-5(1) provides:

It shall be unlawful for any person who has been convicted of a felony under the laws of this state, any other state, or of the United States to possess any firearm or any bowie knife, dirk knife, butcher knife, switchblade knife, metallic knuckles, blackjack, or any muffler or silencer for any firearm unless such person has received a pardon for such felony, has received a relief from disability pursuant to Section 925(c) of Title 18 of the United States Code, or has received a certificate of rehabilitation pursuant to subsection (3) of this section.

Boyington's back and one of Boyington's profile taken after he was in custody. Smith identified the tattoos in the photos as the tattoos he saw on Boyington. Smith said that they were in the area where he saw tattoos on the fleeing motorcyclist. These tattoos were of three images: the face of a Viking, a figure holding a globe, and a horseman. The profile photo showed Boyington's brownish-tinted hair. The circuit court ruled that Smith could testify to what he saw, and the court would not prohibit him from identifying Boyington.

¶11. At trial, in addition to law enforcement officers and Shows, the State called a firearms expert, who testified that the weapon found in the backpack was an operable firearm. The State entered photographs of the area where the motorcycle crashed and the photos of Boyington's back and his profile. The State also called Teresa Aycock, who testified that on the morning of September 28, 2019, Boyington came to her house riding a black motorcycle.

¶12. After the State rested, Boyington called Carrie Breland, who lived in the curve where the motorcycle left the road, to testify. She said that on the day of the incident, she opened her door to let her dog out and noticed a police car and people talking outside. Her dog ran over to them, and she followed. She observed the black motorcycle and asked a police officer what was going on. She was told that the officers were looking for the man who had been on the motorcycle. The police officer told her that he had been able to see the tattoos on the motorcyclist's back from his shirt flying up. The officer also said that the man had brown hair flowing from under the helmet. Breland never saw the motorcyclist herself. Breland also testified that in the past, a bicyclist who had fallen at the same spot had suffered scratches and scrapes.

6

¶13. Before proceeding further, Boyington's counsel informed the court that he wished to introduce photos he had taken of Boyington on October 9, 2019—eleven days after the incident—to show that Boyington had no cuts, scrapes, abrasions, or injuries. The State did not contest the admission of Boyington's photos but responded that if these photos were let in, the State should be able to introduce other photos that had been taken of Boyington earlier when he was arrested. These photos showed Boyington's tattoos, one of which was a blurry photo of a small swastika. Boyington objected in general to "any photograph that would be more prejudicial than probative," but he made no objection to the admission of the photo of the swastika tattoo in particular.[4] The circuit court found that the probative value of admitting the State's photos was not outweighed by any danger of prejudice to the defendant and that in fairness to both sides, the State would be prejudiced if it could not introduce its photos in rebuttal. Thereafter, defense counsel took the stand and testified about the photographs he had taken of Boyington, and they were admitted into evidence. Boyington then rested.

¶14. During rebuttal, the State called Terrell Carson, a corrections major and warden at the Forrest County jail. The prosecutor established that the State's photos of Boyington were official records of the jail, and he proceeded to go through each photo with Carson. Carson

---

[4] Despite how the defendant stated his objection, Rule 403 of the Mississippi Rules of Evidence specifically states:

> The court may exclude relevant evidence if its *probative value* is substantially outweighed by a danger of one or more of the following: unfair prejudice.

(Emphasis added).

identified several of Boyington's tattoos reflected in the photos, including a tattoo of a swastika in one. There was no testimony of where on Boyington's body this tattoo was located nor based on the photograph alone, could the location of the tattoo be identified.

¶15. After the jury convicted Boyington of both charges, he filed a motion for judgment notwithstanding the verdict or, in the alternative, for a new trial. The circuit court denied his motion on June 6, 2022, and on June 15, 2022, Boyington appealed.

¶16. In his appeal, Boyington raises a single issue: whether the circuit court erred in admitting the photograph of the swastika.

## Standard of Review

¶17. The standard of review of the admission of evidence is abuse of discretion. *Taylor v. State*, 353 So. 3d 1114, 1125 (¶56) (Miss. Ct. App. 2023). This same standard applies to the admission of photographs. *Martin v. State*, 289 So. 3d 703, 705 (¶7) (Miss. 2019).

## Discussion

¶18. Rule 401 of the Mississippi Rules of Evidence provides that evidence is relevant if

> (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and
>
> (b) the fact is of consequence in determining the case.

But even relevant evidence may be excluded if it would unfairly prejudice the defendant under Rule 403, which provides:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

In addition, Rule 404 excludes character evidence that seeks only to prove that on a particular occasion the person acted in accordance with the character or trait.

### 1. Relevancy and Probative Value of the Photograph

¶19. A photograph may be admitted if it has "probative value and its introduction serves a meaningful evidentiary purpose." *Beasley v. State*, 136 So. 3d 393, 400 (¶12) (Miss. 2014) (citing *Noe v. State*, 616 So. 2d 298, 303 (Miss. 1993)). A photograph has "meaningful evidentiary purpose" when it aids in describing the circumstances of the crime or supplements or clarifies a witness's testimony. *Wilson v. State*, 276 So. 3d 1241, 1253 (¶28) (Miss. Ct. App. 2018).

¶20. In some cases, gruesome or inflammatory photos may be admissible if they are needed to establish a critical fact. For example, in *Smith v. State*, 984 So. 2d 295, 306 (¶36) (Miss. Ct. App. 2007), we affirmed the trial court's admission of photographs of the murdered victim as he was found at the scene because, among other things, it assisted in estimating the time of death. Additionally, a defendant's tattoos may be displayed to the jury for purposes of his identification as the perpetrator, *Strohm v. State,* 845 So. 2d 691, 698 (¶21) (Miss. Ct. App. 2003), and photographs of tattoos may be admitted to identify a victim. *Roy v. State*, 878 So. 2d 84, 88 (¶14) (Miss. Ct. App. 2003) (involving a witness who identified the deceased by the distinguishing tattoos in a photograph of the deceased). In a federal prosecution for an alleged violation of the Hate Crimes Prevention Act of 2009 ("Shepard–Byrd Act"), 18 U.S.C. § 249(a)(1), a defendant's swastika tattoo, among other white supremacist tattoos, was admissible to prove the essential element of racial motivation.

9

*United States v. Cannon*, 750 F.3d 492, 506-07 (5th Cir. 2014).

¶21.    However, the trial judge should exclude photos that have no evidentiary purpose and only arouse the emotions of the jury.  In *Hewlett v. State*, 607 So. 2d 1097, 1102-03 (Miss. 1992), the Mississippi Supreme Court found a photograph taken of the defendant after his arrest to be irrelevant because there was no demonstrable need for the use of the photograph.  Hewlett's vehicle had crashed into another vehicle, killing the occupants, leading to his conviction of manslaughter.  *Id*. at 1099.  The photographs taken of Hewlett after his arrest were not "mug shots," but were nonetheless not necessary to identify him as the driver and were admitted, resulting in error.  *Id.* at 1102.

¶22.    In this case, as in *Hewlett*, there was no demonstrable need for the photograph of Boyington's swastika tattoo.  Deputy Smith readily identified Boyington from his build, his hair color, and the photograph of the tattoos on Boyington's back, which Smith said were in the area that the fleeing motorcyclist had tattoos.  These tattoos did not contain any swastikas.  Because Smith did not see or identify the swastika tattoo as one he recalled, the photo of the swastika tattoo was not necessary for identification purposes.  Nor was there any demonstrable need for the State's additional photographs of Boyington on rebuttal because they showed no bruising on Boyington's body and did not contradict Boyington's photos.

¶23.    Although the circuit court stated that the State's photos were more probative than prejudicial, the court did not articulate how the swastika photo was probative to the facts in this case.  Clearly, the only tattoos relevant to this case for identification purposes were those

on Boyington's back, and no witness testified that the swastika tattoo was located on Boyington's back. The tattoo established no element of the crimes Boyington was charged with—felony fleeing of law enforcement and possession of a firearm by a felon. Accordingly, the photo of the swastika was irrelevant, served no meaningful purpose, and was not admissible.

¶24. Because the photograph was not admissible under Mississippi Rule of Evidence 401(a), we need go no further in our analysis to discuss its prejudicial nature, though there would be little disagreement that a swastika symbolizes white supremacy, racism, and oppression. *See Daniels v. Harrison Cnty. Bd. of Sup'rs*, 722 So. 2d 136, 140 (Miss. 1998) (Banks, J., concurring) ("[T]he Confederate battle flag conjures up images of and is popularly used to symbolize slavery, white supremacy, racism and oppression. *It takes no back seat to the Nazi Swastika in this regard.*" (emphasis added)). Because the photograph of Boyington's swastika tattoo served no evidentiary purpose, it did not meet the threshold requirement for admissible evidence, and we hold that the circuit court erred in allowing its admission.

2.  *Harmless Error*

¶25. Although we find legal error in the admission of the photograph of the swastika tattoo, we find the error to be harmless because there was other proof presented to the jury of Boyington's guilt that sufficiently supported the jury's guilty verdict. "An error is considered harmless when the weight of the evidence against the defendant was sufficient to outweigh the harm done by allowing admission of the evidence." *Bays v. State*, 344 So. 3d 303, 307

11

(¶12) (Miss. Ct. App. 2022) (internal quotation marks omitted). A "[h]armless-error analysis prevents setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial." *Croft v. State*, 283 So. 3d 1, 11 (¶34) (Miss. 2019).

¶26. In this case, the State presented other evidence against Boyington such that the admission of the swastika tattoo photo had "little, if any, likelihood" of changing the result of his trial. Smith was able to identify Boyington as the driver of the motorcycle by Boyington's build and his hair color. Smith identified Boyington from the tattoos on his back, testifying that when the arresting officers brought Boyington to him, they had Boyington lift his shirt, and Smith saw the tattoos on Boyington's back in the area that matched the area where the fleeing motorcycle driver had tattoos. Other witnesses corroborated that Boyington was the motorcycle driver. Aycock and Shows testified that Boyington was driving a black motorcycle that morning and that the bag with the gun was on the bike. At trial, they identified Boyington as the motorcycle driver. On the day of the chase, Boyington texted Shows and told her he was running from the police. He arrived at Brewer's home, which was located a mile from where the chase ended when the motorcycle went off the road. Shows testified that when Boyington arrived, he was limping from a swollen knee. In addition, Boyington gave false information about his identity to the officers when they first encountered him.

¶27. Smith testified that the motorcycle had no tag; thus, he was authorized to make the traffic stop. *See* Miss. Code Ann. § 27-19-323 (Rev. 2017) (stating that no vehicle shall be operated in the State unless a distinguishing number tag is conspicuously displayed in a

12

manner that it can be readily read); *Wilson v. State*. 358 So. 3d 1069, 1074 (¶25) (Miss. Ct. App. 2022) (holding a police officer had reasonable suspicion to initiate a traffic stop when the officer reasonably suspected the car had no license tag). When Boyington sped off instead of complying with Smith's directive, the second element of felony fleeing was proved. Boyington then led Smith on a high-speed chase for nearly a mile and a half until he crashed. This high-speed chase satisfied the third element of felony fleeing, namely that the driver "operate[s] a motor vehicle in a manner manifesting extreme indifference to the value of human life." *Rowell v. State*, 347 So. 3d 231, 235 (¶¶17-18) (Miss. Ct. App. 2022). Thus, there was sufficient evidence for the jury to find Boyington guilty apart from the erroneous admission of the swastika tattoo photo.

¶28. There was also sufficient evidence for the jury to find Boyington guilty of being a felon in possession of a firearm. "The crime of felon in possession of a firearm contains two elements. The State must prove: (1) the defendant possessed a firearm, and (2) the defendant had previously been convicted of a felony crime." *Williams v. State*, 305 So. 3d 1122, 1129 (¶16) (Miss. 2020) (citation omitted). In this case, the firearms expert testified that the gun in the gray backpack was a weapon under the statute. Shows identified the gray backpack, in which she had put her ID, as one Boyington had earlier that day. Deputy Smith found the backpack with the gun next to the motorcycle when it crashed. Clearly, the jury was presented with enough evidence to conclude beyond a reasonable doubt that the last person in possession of the backpack and gun was the driver of the motorcycle, i.e., Boyington. *See Dees v. State*, 758 So. 2d 492, 496 (¶11) (Miss. Ct. App. 2000) (making a prima facie case

of constructive possession of a handgun by proving that it was found in a vehicle under the exclusive control of the defendant). Here, the jury had ample evidence to find that the firearm was in the possession of Boyington, who stipulated that he was a felon. Accordingly, the error in the admission of the photograph of the swastika tattoo was harmless.

## Conclusion

¶29. Under the facts and circumstances of this case, we find the circuit court erred in admitting the photograph of Boyington's swastika tattoo. However, because there was sufficient evidence from which the jury could find Boyington guilty beyond a reasonable doubt, the error was harmless, and we affirm his convictions and sentences.

¶30. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR. WILSON, P.J., GREENLEE AND SMITH, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**